Jay CANNON, Thomas Carey, Stevie Powell, and Service Employees International Union, AFL–CIO, CLC, Plaintiffs–Appellees,

v.

James EDGAR, Governor of Illinois and Roland W. Burris, Attorney General of Illinois, Defendants–Appellants.

No. 93–2968.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1994.

Decided Sept. 6, 1994.

J. Peter Dowd, Robert E. Bloch, Linda Wyetzner, Dowd & Bloch, Chicago, IL, James B. Coppess, Washington, DC, Marsha S. Berzon (argued), Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for plaintiffs-appellees.

Nathan Lewin (argued), Miller, Cassidy, Larroca & Lewin, Washington, DC, for defendants-appellants.

Before BAUER, COFFEY, and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

In 1992, Illinois enacted the Illinois Burial Rights Act. Passed in response to a strike by a union of gravediggers, the Burial Rights Act requires, among other things, that cemeteries and unions agree on a pool of workers to perform interments for persons whose religious faith requires that their dead be buried within a day or two of death. A gravediggers' union, the Service Employees International Union, Local 106, AFL–CIO, union member Stevie Powell, and union leaders Jay Cannon and Thomas Carey ("the gravediggers") sued Illinois Governor James Edgar, Illinois Attorney General Roland Burris, and several Chicago-area cemeteries for violations of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* The gravediggers claimed that the NLRA preempts the Burial Rights Act and that the Burial Rights Act therefore violates the Supremacy Clause of the Constitution. The district court agreed and granted summary judgment for the gravediggers. Governor Edgar and General Burris appeal.

## I.

From December 20, 1991 until January 31, 1992, the gravediggers became involved in a labor dispute with twenty-six Chicago-area cemeteries. The gravediggers went on strike, and the cemeteries locked out the strikers. As a result of the lock-out, the gravediggers were not able to perform interments, and the cemeteries prohibited families or representatives of Jewish decedents from entering the cemeteries for purposes of interment even though the families and representatives had previously purchased burial plots for the purpose of burying their dead. Interments were delayed at the cemeteries, in some cases for up to a month. For the decedents, their families, and their representatives, the delayed burials violated the requirements of Jewish law, which requires burial within one or two days after death.

Certain members of the Jewish faith and the Chicago Rabbinical Council filed suit in the Circuit Court of Cook County, Illinois against the cemeteries in order to gain access to their burial plots. On January 9, 1992, the court entered a preliminary injunction ordering the cemeteries to allow burial of the Jewish decedents. The court's order also required the cemeteries to assist the families and representatives in facilitating the burials.

After the court entered the order, many gravediggers volunteered to perform interments of Jewish decedents at an agreed fee under the direction of a court-appointed receiver.

After the strike was settled, and in response to the delayed burials, the Illinois legislature passed and Governor Edgar

signed the Illinois Burial Rights Act. 820 ILCS 135/2.1.[1] The Burial Rights Act became effective on September 18, 1992. It applies only to burials that are required to be performed in a timely manner consistent with religious tenets and beliefs. 820 ILCS 135/2.2. Judaism, Islam, and Zoroastrianism were identified as religions that require burial of the dead within a day or two of death.

The Burial Rights Act requires that the cemeteries and gravediggers negotiate for the establishment of a pool of workers designated to perform religiously required interments during labor disputes. The parties were to agree to such a labor pool by January 16, 1993. If they did not agree on a pool of workers by this date, they would be in violation of the Burial Rights Act. If the parties do not reach a labor-pool agreement, if designated members of a labor pool refuse to perform religiously required burials, or if a religiously required burial is otherwise delayed, in violation of the Burial Rights Act, the Burial Rights Act authorizes a court to grant appropriate relief, including injunctive relief. If the gravediggers fail to negotiate in good faith to establish the labor pools required under the Burial Rights Act, they could also be subject to an award of attorney's fees and the imposition of fines of up to $1,000 for each religiously required interment found to have been delayed in violation of the Burial Rights Act.

The collective bargaining agreement between the gravediggers and the cemeteries expired on December 31, 1992. On December 1, 1992, the gravediggers and the cemeteries began negotiations over the terms of a successor collective bargaining agreement. Early in the negotiations, the cemeteries advised the gravediggers that they intended to abide by the provisions of the Burial Rights Act. The gravediggers responded by telling the cemeteries that they considered the Burial Rights Act intolerable and illegal and that they would therefore not comply with its requirements.

The gravediggers filed this lawsuit in the district court on December 23, 1992. In their complaint, the gravediggers alleged that the Burial Rights Act is unconstitutional because it is preempted by the NLRA and, hence, violates the Supremacy Clause of Article VI of the Constitution. The gravediggers also claimed that the Burial Rights Act es-

---

1. There are two relevant sections to the Illinois Burial Rights Act: 820 ILCS 135/2.1 and 135/2.2. 820 ILCS 135/2.1 provides:

§ 2.1 Access to Interment Rights. (a) If the owner of an interment right in a cemetery or his or her legatees, executor or administrator desires to use that interment right for interment purposes, necessitated by the decedent's membership in a religious sect whose tenets and beliefs require burial within a specified period of time, and a labor dispute has resulted in a disruption of normal interment services at that cemetery, the owner of the interment right or his or her heirs and legatees, executor or administrator may arrange for the performance of the interment by notifying the cemetery authority and designating individuals to perform the interment; provided that such interment and all related work necessary to perform the interment is performed at the direction and under the supervision of the cemetery authority's management personnel and from a pool of workers established pursuant to an agreement between the cemetery authority and the appropriate labor union. An agreement establishing such pool of workers to provide for the religiously required interments as set forth in this Section shall be negotiated and entered into within 120 days of the effective date of this amendatory Act of 1992.

(b) In the event of a violation of this Section, a court shall enter an injunction granting appropriate relief, including, in the case of a willful violation, an award of attorney's fees and the imposition of a fine not to exceed $1,000 for each interment which is found to have been delayed in violation of this Section. The failure of a cemetery authority or a labor union to negotiate in good faith to establish a pool of workers as provided in subsection (a) constitutes a willful violation of this Section for purposes of this subsection (b), but only if the failure to negotiate in good faith results in the delay of a religiously required interment in violation of this Section.

(c) The circuit court shall give priority to a proceeding brought pursuant to this Section over other civil matters.

820 ILCS 135/2.2 provides:

§ 2.2. Application of this Act. The sanctions and court proceedings under Section 2.1 of this Act are intended, as a matter of public policy, to apply only to burials required in a timely manner consistent with religious tenets and beliefs, and not to the labor dispute that would continue on beyond the limited scope of religiously required burials.

tablishes religion in violation of the First and Fourteenth Amendments of the Constitution.

On January 11, 1993, the district court signed an agreed order which enjoined the enforcement of the Burial Rights Act pending a final determination by the court on the merits of the gravediggers' suit. The district court issued its final decision on July 13, 1993. *Cannon v. Edgar*, 825 F.Supp. 1349 (N.D.Ill.1993). The court held that the NLRA preempts the Burial Rights Act and that, therefore, the Burial Rights Act violates the Supremacy Clause. *Id.* at 1362. The court did not reach the establishment of religion issue as the Supremacy Clause analysis disposed of the case.

In this appeal, Governor Edgar and General Burris claim that the NLRA does not preempt the Burial Rights Act and that the Burial Rights Act does not violate the Supremacy Clause. They also contend that the Burial Rights Act satisfies First Amendment standards because it assists in the free exercise of religion.

## II.

This case presents purely legal questions: (1) whether the NLRA preempts the Burial Rights Act and is therefore unconstitutional; and (2) whether the First Amendment's Free Exercise Clause saves the Burial Rights Act from preemption. We review the district court's answer to those questions *de novo*. *NLRB v. State of Ill. Dep't of Employment Sec.*, 988 F.2d 735, 737 (7th Cir.1993).

We begin with preemption and the Constitution's Supremacy Clause. In relevant part, the Supremacy Clause declares that "the Laws of the United States which shall be made in Pursuance [of the Constitution] . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. This provision invalidates all state laws that conflict or interfere with acts of Congress. *Rose v. Arkansas State Police*, 479 U.S. 1, 3, 107 S.Ct. 334, 334–35, 93 L.Ed.2d 183 (1986); *State of Ill. Dep't of Employment Sec.*, 988 F.2d at 737. In determining whether a congressional statute (here, the NLRA) preempts a state statute (here, the Burial Rights Act), we must decide if Congress intended its act to

preempt a particular state statute. *Hawaiian Airlines, Inc. v. Norris*, —— U.S. ——, ——, 114 S.Ct. 2239, 2242–44, 129 L.Ed.2d 203 (1994).

The NLRA is an act of Congress made "in Pursuance" of the Constitution. *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of America v. Wisconsin Employment Relations Bd.*, 340 U.S. 383, 399, 71 S.Ct. 359, 368, 95 L.Ed. 364 (1951); *State of Ill. Dep't of Employment Sec.*, 988 F.2d at 738. As such, the NLRA is the "supreme Law of the Land," and any state statute that the NLRA preempts necessarily violates the Constitution.

The NLRA is a comprehensive code passed by Congress to regulate labor relations in activities that affect interstate and foreign commerce. *Nash v. Florida Indus. Comm'n*, 389 U.S. 235, 238, 88 S.Ct. 362, 365–66, 19 L.Ed.2d 438 (1967); *State of Ill. Dep't of Employment Sec.*, 988 F.2d at 738. It safeguards the right of employees to self-organization and to select representatives for collective bargaining. 29 U.S.C. § 157; *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33, 57 S.Ct. 615, 622, 81 L.Ed. 893 (1937). The NLRA reflects congressional intent to create a uniform, national body of labor law interpreted and administered by a centralized agency, the National Labor Relations Board. *New York Telephone Co. v. New York State Dep't of Labor*, 440 U.S. 519, 528, 99 S.Ct. 1328, 1334–35, 59 L.Ed.2d 553 (1979); *State of Ill. Dep't of Employment Sec.*, 988 F.2d at 738.

The NLRA enumerates unfair labor practices by both employees and employers, 29 U.S.C. § 158(a) and (b), and in particular declares as unfair (and therefore illegal) interference by an employer with the right to self-organization and collective bargaining. 29 U.S.C. § 158(a)(1). It also defines as an unfair labor practice the refusal by an employer to bargain collectively with employee representatives. 29 U.S.C. § 158(a)(5). And finally, for our purposes here, the NLRA requires both employers and self-organized (that is, unionized) employees to bargain in good faith. 29 U.S.C. § 158(d); *Golden State Transit Corp. v. City of Los Angeles,*

475 U.S. 608, 616, 106 S.Ct. 1395, 1399–1400, 89 L.Ed.2d 616 (1986).

The NLRA does not require that the parties reach an agreement. Instead, it leaves the bargaining process largely to the parties. *Id.* at 616, 106 S.Ct. at 1399–1400; *American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 317, 85 S.Ct. 955, 966–67, 13 L.Ed.2d 855 (1965).

■ In the context of the NLRA, the Supreme Court has developed two preemption doctrines. The first, *Garmon* preemption, forbids state and local regulation of activities that the NLRA protects or prohibits or arguably protects or prohibits. *Building & Trades Council v. Associated Builders and Contractors of Massachusetts/Rhode Island,* — U.S. —, —, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244–45, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959). The *Garmon* doctrine is designed to prevent conflict between state and local regulation and Congress' integrated scheme of regulation embodied in 29 U.S.C. §§ 157 & 158.

■ *Garmon* preemption is not, however, absolute. A claim is not preempted under *Garmon* if the regulated activity is (1) merely of peripheral concern to the federal labor laws or (2) touches interests deeply rooted in local feeling and responsibility. *Belknap, Inc. v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983).

■ In this case, Governor Edgar and General Burris contend that these exceptions to *Garmon* preemption apply to save the Burial Rights Act from preemption. We disagree.

The Supreme Court has made clear that these exceptions apply in matters of general state law—in particular, criminal and tort law. In *Farmer v. United Bhd. of Carpenters and Joiners*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Court held that the NLRA did not preempt a state tort action brought by a union member against his union. The tort at issue in *Farmer* was the intentional infliction of emotional distress, a cause of action unrelated to the collective bargaining process that Congress so carefully intended to regulate when it passed the NLRA. *Id.* at 292, 296, 97 S.Ct.

at 1059, 1061; *see also Belknap,* 463 U.S. at 512, 103 S.Ct. at 3184 (NLRA does not preempt state law action for misrepresentation and breach of contract by scab against employer); *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (NLRA does not preempt state law trespass action); *Keehr v. Consolidated Freightways of Delaware, Inc.,* 825 F.2d 133 (7th Cir.1987) (NLRA does not preempt a state law claim for intentional infliction of emotional distress).

Similarly, the "[p]olicing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States." *Machinists v. Wisconsin Employment Relations Comm'n.,* 427 U.S. 132, 136, 96 S.Ct. 2548, 2551, 49 L.Ed.2d 396 (1976). Consistent with this theme, "[i]f an employer hires goons to beat up picketers, this violates the [NLRA], but it also is a common law battery and the state is not forbidden to provide the usual tort remedy for it." *National Metalcrafters v. McNeil,* 784 F.2d 817, 828 (7th Cir.1986).

The Burial Rights Act is unlike these examples. The Burial Rights Act does not create a typical, common law tort, as in *Farmer, Belknap, Sears, Roebuck,* and *Keehr.* And the Burial Rights Act does not regulate public safety; it has nothing at all to do with policing the potential or actual violence that has plagued labor disputes. Rather, the Burial Rights Act is a direct intrusion by the state into the collective bargaining process. The Burial Rights Act purports to regulate a particular term of the bargaining process—that of a pool of workers—and, further, requires the parties to actually agree on a particular pool of workers or face sanctions at the hands of the Illinois courts.

The NLRA does not tolerate this kind of invasion by a state into the collective bargaining process. As *Garmon* requires, the collective bargaining process is regulated by the NLRA. 29 U.S.C. §§ 157 & 158. And, as we have explained, the NLRA leaves the substantive terms of collective bargaining agreements to management and union repre-

sentatives to hammer out in the collective bargaining process.

As to the first *Garmon* exception, the Burial Rights Act is not concerned with something peripheral to the NLRA. Indeed, performing burials, including burials during the course of a labor dispute, is the very subject that the cemeteries and the gravediggers negotiate about in the collective bargaining process.

And as to the second *Garmon* exception, there is nothing deeply rooted in local feeling that would allow Illinois to encroach on the process of collective bargaining in the manner directed by the Burial Rights Act. The interment of deceased persons is something common to every community in the United States. The interment of the smaller category at issue here (particular religious groups) is not something deeply rooted in local feeling, like state law torts or police protection against goons and other like-minded perpetrators of labor-related violence. Instead, the Burial Rights Act gives the parties a choice: agree on a pool of workers or else face punishment by the state in the form of injunctions, money damages, and attorney's fees. The NLRA does not permit this kind of direct state regulation of the collective bargaining process.

The *Garmon* preemption exceptions do not save the Burial Rights Act from preemption by the NLRA.

Governor Edgar and General Burris next contend that the second NLRA preemption doctrine, *Machinists* preemption, does not preempt the Burial Rights Act. They argue in particular that the Burial Rights Act is not preempted by *Machinists* because the Burial Rights Act does not interfere with the economic forces that influence collective bargaining. Again, we disagree.

■ Established by the Supreme Court in *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), *Machinists* preemption prohibits state and municipal regulations of areas that Congress left to the free play of economic forces. *Building & Trades Council*, —— U.S. at ——, 113 S.Ct. at 1195. By protecting against state interference with policies implicated by the structure of the NLRA, *Machinists* preemption preserves Congress' intentional balance between the power of management and labor to further their respective interests by use of their respective economic weapons. *Building & Trades Council*, —— U.S. at ——, 113 S.Ct. at 1195; *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985).

In short, Congress has been rather specific when it has outlawed particular economic weapons. *Golden State Transit Corp.*, 475 U.S. at 614, 106 S.Ct. at 1398–99. Congress left some forms of economic pressure unregulated, while it banned others. *Id.* at 614, 106 S.Ct. at 1399. "States are therefore prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts ... unless such restrictions presumably were contemplated by Congress." *Id.* at 615–16, 106 S.Ct. at 1399.

■ For the same reasons that the Burial Rights Act does not satisfy the two *Garmon* exceptions, it is likewise preempted by *Machinists*. The Burial Rights Act intrudes on the collective bargaining process in a variety of ways; it orders the parties to negotiate as to a specific substantive condition—that of a pool of workers to perform interments during labor disputes. And more invasive, the Burial Rights Act orders the parties to agree on a pool of workers, or face sanctions for a failure to do so.

This case is similar to *Golden State Transit Corp.* There, the City of Los Angeles refused to renew a taxicab franchise after a taxi company's drivers went on strike. *Golden State Transit*, 475 U.S. at 609, 106 S.Ct. at 1395. The Court held that, under *Machinists*, the city's action was preempted by the NLRA. *Id.* at 619, 106 S.Ct. at 1401. The Court noted that the NLRA leaves the bargaining process largely to the parties, and that the city could not condition the taxicab company's franchise renewal on the settlement of the labor dispute. *Id.* at 616, 619, 106 S.Ct. at 1399–1400, 1401. Such a practice, if allowed, would intrude into the collective bargaining process. *Id.* at 619, 106 S.Ct. at 1401.

The Burial Rights Act likewise meddles with the collective bargaining process. It directly interferes with the ability of the cemeteries and gravediggers to reach an agreement unfettered by the (labor) restrictions of state law. It is therefore preempted by the NLRA.

Governor Edgar and General Burris raise one other issue that merits attention. They claim that the Free Exercise Clause of the First Amendment protects the Burial Rights Act from preemption. In support of their position, Governor Edgar and General Burris cite *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). The Court in *Catholic Bishop* did not, however, reach the Free Exercise issue. It held only that teachers in schools operated by a church to teach both religious and secular subjects were not within the jurisdiction of the NLRA. *Id.* at 507, 99 S.Ct. at 1322.

Incorporated against the states, the Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." Nothing about this constitutional provision allows a state, in violation of the NLRA, to require private parties to a labor dispute to guarantee the free exercise rights of third parties. No court has ever held as much. Nor do we.

### III.

When Congress passed the NLRA, it closed to state regulation the field of peaceful strikes in industries affecting commerce. *Amalgamated Ass'n,* 340 U.S. at 394, 71 S.Ct. at 365; *International Union v. O'Brien,* 339 U.S. 454, 457, 70 S.Ct. 781, 782–83, 94 L.Ed. 978 (1950). When it enacted the Burial Rights Act, Illinois sought to regulate the gravediggers' peaceful strike against the cemeteries. In doing so, Illinois exceeded its authority.

The cemeteries and the gravediggers are, of course, free to agree to a pool of workers to perform interments during strikes. But Illinois may not order them to do so.

The NLRA preempts the Burial Rights Act and the Burial Rights Act is therefore unconstitutional. The decision of the district court is

Affirmed.